## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A

## SEARCH WARRANT

I, Juan Naranjo, Task Force Officer with Homeland Security Investigations, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a blue Motorola cellular phone, IMEI 355195710996447, (hereafter TARGET DEVICE) which are currently in law enforcement possession and more specifically described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B. This electronic device was recovered from the car Harry Ricardo NEGRON (hereafter NEGRON) was driving subsequent to his arrest for violations of 8 U.S.C. § 1324(a)(1)(A)(ii), transporting illegal aliens in furtherance of an illegal entry on November 15, 2022.

2.      The purpose of this application is to seize evidence, more particularly described in Attachment B of this search warrant application, of violations of 8 U.S.C. § 1324(a)(1)(A)(v)(I), conspiracy to commit alien smuggling, 8 U.S.C. § 1324(a)(1)(A)(v)(II), aiding or abetting the crime of alien smuggling, and 8 U.S.C. § 1324(a)(1)(A)(ii), transporting aliens in furtherance of an illegal entry.

3.      Your affiant is a law enforcement agent of the United States who is empowered by federal law to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, 19, and 21 of the United States Code.

4.      Your affiant is a Border Patrol Agent with U.S. Customs and Border Protection and is assigned to work as a Task Force Officer with Homeland Security Investigations (HSI) at the Assistant Special Agent in Charge (ASAC) Sells, Arizona office. Your affiant has been a Task Force Officer with HSI since June of 2022. During this time, your affiant has been assigned to a human smuggling investigations group and has conducted and assisted investigations involving human smuggling, weapons offenses, and immigration violations.

5.     Your affiant has been employed by the United States Border Patrol (USBP) as a patrol agent (BPA) since April 2015. As a BPA, assigned to the Three Points Station, Tucson Sector, your affiant has conducted enforcement operations to deter, interdict, and seize individuals and contraband seeking to enter, or which had previously entered the United States in violation of U.S. immigration laws and customs regulations. As a BPA, your affiant has worked in the Intelligence Collection Team (ICT), interviewing Undocumented Non-Citizens (UNC), and human smuggling participants to identify illegal immigration traffic patterns, collect intelligence, and deter and prosecute violators. While assigned to ICT, your affiant gained knowledge and insight regarding transnational criminal organizations operations in the human smuggling business, including methods of travel through Mexico, payment arrangements, lodging of migrants, detection avoidance, and means of communications between all participants.

Your affiant has previously worked as Correctional Deputy Probation Officer (CDPO) for the San Diego County Probation Department from August 2012 to November 2014 and was responsible for maintaining safety and security at a juvenile detention facility. Your affiant assisted reforming troubled juveniles by helping them formulate a plan for their future and holding them accountable for violating the law, including drug smuggling through an international border.

6.     Your affiant has attended and completed the Basic Course for Border Patrol Agents, at the Federal Law Enforcement Training Centers in Artesia, New Mexico. Your affiant has a Bachelor of Science in Criminal Justice from San Diego State University and a Master of Arts in Public Safety Leadership and Administration from Arizona State University. Your affiant has received and continues to receive specialized training in constitutional criminal procedure, drug identification and recognition, interview and interrogation techniques, search and seizure, evidence collection, surveillance operations, and standard operating procedures pertaining to various transnational criminal organizations. Your affiant received this knowledge from training courses, other law enforcement officers/agents conducting human and narcotics smuggling investigations, as well as from criminal defendants and suspects.

7.     Throughout his career, your affiant has performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the management of investigations in several investigative program areas to include human smuggling, drug smuggling, and

immigration violations; (b) conducting research in both open source and law enforcement sensitive databases and applications on individuals suspected to be involved in criminal activity; (c) performing physical surveillance and thereby observing and recording movements of persons suspected of various criminal activities; and (d) interviewing witnesses and cooperating individuals.

8.      Based on his background, training, and experience, your affiant knows that individuals who are involved in human smuggling and trafficking engage in the following techniques, tactics, and procedures:

a. Use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating with smugglers, coordinators, and other transporters or drivers to coordinate their operations. They also use cellular telephones to communicate with the same individuals during counter surveillance activities, and to warn co-conspirators of the presence of law enforcement or other obstacles to their plans.

b. Use all the communication technologies available within the particular cellular phone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, photo and video images, and contact lists, as well as any third-party applications that offer the above features to accomplish their criminal activities.

c. Use multiple cellular telephones and often change phone numbers to avoid detection by law enforcement.

d. Use inexpensive and expendable "throw down" or "burner" phones which are solely to conduct smuggling operations.

9.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all your affiant's knowledge about this investigation. The information contained in this affidavit is based upon review of various official reports, conversations with other federal agents and law enforcement officers, and your affiant's personal observations, training, and knowledge.

**PROBABLE CAUSE**

10.     At approximately 7:50 a.m., on November 15, 2022, Border Patrol Agent (BPA) Menchaca arrived at State Route 86 near mile marker 114 to assist Tohono O'odham Police Department (TOPD) Officer Degrazia, who requested Border Patrol assistance. TOPD Officer Degrazia had stopped a blue 2006 Ford Explorer for exceeding the posted speed limit and observing that the driver, NEGRON (DOB: 08/16/1981), was not wearing a seatbelt.

11.     TOPD Officer Degrazia requested Border Patrol assistance because he had observed several people in the rear of the vehicle attempting to hide under some blankets and assorted clothing. Seven passengers were removed from the vehicle. BPA Menchaca identified himself as a BPA and questioned each passenger regarding their country of citizenship. Four passengers claimed Mexican citizenship and three claimed Guatemalan citizenship. No passenger had proper documents allowing them to legally enter, pass through, or be present in the United States. NEGRON was in possession of TARGET DEVICE at the time of detention. All migrants were in possession of at least one cellular device.

12.     The seven undocumented non-migrants were later identified as, Barrios-Duran, Julio (DOB: 06/30/1982; COC: Mexico), LEON-Garcia, Mayeli Karina (DOB: 08/24/1987; COC: Mexico), LOPEZ-Rodriguez, Alex Jhovanny (DOB: 01/08/1996; COC: Mexico), MORALES-Jimenez, Yuliana (DOB: 11/23/2002; COC: Mexico), MORALES-Ramirez, Jose (DOB: 11/24/1981; COC: Guatemala), RAMIREZ-Linez, Juan (DOB: 06/24/1991; COC: Guatemala), and SOTO-Morales, Patricio (DOB:03/03/1979; COC: Guatemala).

13.     After all vehicle occupants were transported to the Tucson Coordination Center for processing, BPAs from the Intelligence Collection Team (ICT) interviewed all UNCs to take their statements about the smuggling incident. Multiple UNCs stated they walked/received instructions to go to Topawa, Arizona. One UNC in the group stated she stayed overnight at a woman's house (understood to be in Topawa, Arizona). This UNC stated the female homeowner made a few phone calls and then told the group of UNCs that a vehicle would arrive shortly to pick them up. Later a driver arrived, picked up the UNCs, and was apprehended shortly after picking them up.

14.     In your affiant's training and experience, he knows that stash house operators communicate

with other members of the human smuggling organization by phone or other electronic communication systems to coordinate the pickup of UNCs. This includes communicating with an overall smuggling coordinator, and also potentially with a load driver who would actually pick up the UNCs. Your affiant is aware that coordinators, stash house operators, and drivers communicate by phone and electronic communication systems to establish, among other things, when the UNCs have arrived at the stash house, verify that the UNCs are ready for pickup, determine where the UNCs are located for the pickup or advise the UNCs to be ready, to direct the driver to where the UNCs are located, and communicate to the driver where to take the UNCs.

15.     Based on this knowledge of smuggling organizations' communications and the UNCs statement about the stash house operator's phone calls, your affiant is confident that the load driver, Harry Ricardo NEGRON, received some form of telephonic or electronic communication advising him that the UNCs were ready for pickup/where they were located. Your affiant is also aware that load drivers often use mapping applications to guide them to where they need to pick up the UNCs and also to where they need to drop them off.

16.     Based on your affiant's training, experience, and information obtained during the investigation, your affiant believes that the TARGET DEVICE was utilized to communicate with other members of the humans smuggling organization to coordinate the pickup of the UNCs and to provide navigation for the smuggling event, during and/or after the commission of this criminal human smuggling event.

**TECHNICAL TERMS**

17.     Based on your affiant's training and experience, the following technical terms are used to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. SIM Card: A Subscriber Identification Module or "SIM" Card, is a smart card that stores data for some telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages.

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. GPS: A GPS navigation device uses the Global Positioning System (generally abbreviated "GPS") to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such

navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

g. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

h. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

i. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the

range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

j. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18.     In your affiant's training and experience, the nature of alien smuggling almost universally necessitates frequent and immediate communication between co-conspirators and accomplices. As such, examining data stored on devices of this type frequently uncover evidence that reveals who possessed or used the device, the rank and scope of their participation in the smuggling organization, who their accomplices were, as well as revealing or validating particular details regarding the instant criminal conduct.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time, even after content is initially deleted by the user. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your affiant is applying would permit HSI, or their designee, examination of the above listed device and or associated peripheral equipment, including by way of example but not limitation, subscriber identity module (SIM) card(s), removable storage media, and or paired/synced device(s) for the evidence listed in the affidavit and warrant using a range of data analysis techniques.

21.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22.     Based upon the foregoing, your affiant submits that there is sufficient probable cause to believe that TARGET DEVICE contains evidence of the crimes of 8 U.S.C. § 1324(a)(1)(A)(v)(I) - conspiracy to commit alien smuggling, 8 U.S.C. § 1324(a)(1)(A)(v)(II) - aiding or abetting the crime of alien smuggling, and 8 U.S.C. § 1324(a)(1)(A)(ii) - transporting aliens in furtherance of an illegal entry.

JUAN NARANJO
Digitally signed by JUAN NARANJO
Date: 2023.01.19 15:59:28 -07'00'

_____
Juan Naranjo, Task Force Officer
Homeland Security Investigations, Affiant

Subscribed and sworn to before me this __19th__ day of January, 2023.

_____
Honorable Leslie A. Bowman
United States Magistrate Judge